HARRIET K. SULLIVAN v. JOHN F. SULLIVAN ET AL.

SUPERIOR COURT    NEW LONDON COUNTY    FILE No. 18651

Memorandum filed July 17, 1950.

*John J. McGarry* and *Harry C. Brogan,* of New London, for the Plaintiff.

*Morris Lubchansky, Leon J. Bascom* and *Richard F. Corkey,* of New London, for the Defendants.

TROLAND, J.   This is an action for a declaratory judgment that a decree of divorce granted in Nevada on June 7, 1947, to John F. Sullivan, then the husband of the plaintiff, was colorable and did not dissolve the marriage relation.

John F. Sullivan was living at the time the action was brought but died a few months thereafter.   The defendant, Richard F. Corkey, as administrator of John F. Sullivan's estate was made a party defendant some time later.

The plaintiff Harriet K. Sullivan and John F. Sullivan were married June 27, 1918.   They lived together in New London until May 15, 1942, and six children were born to them.   On

May 15, 1942, John F. Sullivan and Harriet K. Sullivan separated and never thereafter lived together as husband and wife. The regrettable and basic cause for the breakup of this family was the periodic excessive use of alcoholic liquor by John F. Sullivan. Apparently each of the parties felt aggrieved and sometime thereafter, although Harriet K. Sullivan offered to forgive and forget on her part, John F. Sullivan was unwilling to resume living with her.

John F. Sullivan was engaged in the furniture moving, storage and warehouse business as J. F. Sullivan Storage Company in New London. For a considerable period of time after the separation from his wife he lived in a small apartment adjacent to his office.

In July, 1941, in response to an advertisement for clerical help, the defendant Winona P. Sullivan, then Winona Peters, a married woman, applied for employment with the J. F. Sullivan Storage Company and entered the employ of that company. Mrs. Peters remained in said employ until January 13, 1944, during which period a romantic interest developed between John F. Sullivan and Winona Peters, which continued for a long time thereafter. By March 14, 1945, the march of events had resulted in the institution of a suit by Harriet K. Sullivan against Winona Peters, for damages for alleged alienation of affections of John F. Sullivan. On March 26, 1945, Harriet K. Sullivan complained to the prosecuting officials of New London and caused a warrant to be issued for the arrest of her husband on a charge of nonsupport. A short time thereafter, on June 27, 1945, a written agreement was entered into between Harriet K. Sullivan and John F. Sullivan in which it was recited that all efforts at reconciliation had failed and that it was the desire of the parties to adjust and settle once and for all time their interests in one another's property. Provision was made for a cash payment to Mrs. Sullivan and for weekly payments thereafter and Mrs. Sullivan renounced her right to participate in the distribution of her husband's estate on his death. On the same date Harriet K. Sullivan withdrew her action for alienation of affections against Winona Peters.

John F. Sullivan and Winona Peters continued to be interested in each other. In the months following and prior to March, 1946, John F. Sullivan consulted counsel with reference to the securing of a divorce by him in a state other than Con-

necticut. Winona Peters received a divorce in Massachusets from her husband John Peters, and also gave birth to a son, of which child John F. Sullivan then believed he was the father.

In April, 1946, John F. Sullivan caused his business to be incorporated as The John F. Sullivan Storage Company, retaining a three-quarters interest therein with his son Robert K. Sullivan holding a one-quarter interest. The business was prospering. Beginning in the spring of 1946 John F. Sullivan arranged his business affairs so as to facilitate his living outside of Connecticut and to enable him to exercise a remote control over his New London interests. He kept his own counsel in most everything. He did not reveal his plans to his own children, whose loyalty to their mother seems to have caused some restraint in relationship with their father.

He gave his sister N. Augusta O'Sullivan an unlimited power of attorney to act for him. He created a special bank account in which moneys for his personal benefit was to be deposited. In February, 1947, he caused his corporation, The John F. Sullivan Storage Company, to grant him indefinite leave of absence and on February 22, 1947, he left New London for the west. For some time prior to departure his living accommodations in New London had been limited to a small apartment, which thereafter he did not maintain.

Before leaving New London he arranged through a lawyer in New Haven for counsel in Reno, Nevada. The New Haven lawyer had advised Mr. Sullivan that if he wished a Nevada divorce which would be valid he would have to make up his mind to stay there. Mr. Sullivan informed his lawyer that he was going to dispose of his holdings and that he, Sullivan, "was bidding New London goodbye." Mr. Sullivan left New London by motor and somewhere outside of Connecticut he joined Winona Peters and her daughter and they proceeded across the country and eventually arrived at Reno, Nevada, on March 17, 1947.

In Reno Mr. Sullivan engaged as quarters for himself a room with semi-private bath, in a small place called "Manhattan Guest House." He stated to the proprietor he would make his home in Reno and intended to live in Nevada permanently. A short time later, after looking around in Reno and an adjacent community, he engaged other quarters in Las Vegas. Shortly after his arrival in Nevada, Mr. Sullivan, with the aid of real

estate brokers, to whom he stated he intended to stay in Nevada, looked around for properties to purchase, both for a home and also for investment purposes.

On April 29, 1947, Mr. Sullivan filed suit against Harriet K. Sullivan for divorce. Process was served on Harriet K. Sullivan in New London in accordance with provisions of Nevada law. Harriet K. Sullivan did not enter her appearance either in person or by attorney and did not in any way participate in the Nevada proceedings. On June 3, 1947, a default was entered against Harriet K. Sullivan and the Nevada court proceeded to hear and determine the case. It found that John F. Sullivan was domiciled in Nevada, that the court had jurisdiction, and it granted its decree divorcing John F. Sullivan from Harriet K. Sullivan.

The parties are in substantial agreement as to the law applicable to this case.

Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking— is founded on domicil. *Williams* v. *North Carolina,* 325 U. S. 226, 229, 89 L. Ed. 1577; *Bell* v. *Bell,* 181 U. S. 175, 45 L. Ed. 804.

Domicil on the part of John F. Sullivan was a necessary condition precedent to the jurisdiction of the Nevada court. *Gildersleeve* v. *Gildersleeve,* 88 Conn. 689, 692; *Rice* v. *Rice,* 134 Conn. 440, 445. This jurisdictional fact, which essentially involves the good faith of John F. Sullivan in taking up his residence in Nevada, is a proper subject for re-examination by the courts of this state.

Harriet K. Sullivan was not precluded in the present action from challenging the finding of the Nevada court that John F. Sullivan was, at the time of the divorce, domiciled in that state. *Rice* v. *Rice,* 336 U. S. 674, 676, 93 L. Ed. 957. A few preliminary observations may be in order.

Despite the vicious criticism of what has been characterized as "the ex parte divorce" such proceedings are recognized as valid and sanctioned by the Supreme Court of the United States. *Williams* v. *North Carolina,* 317 U. S. 287, 87 L. Ed. 279; *Sherrer* v. *Sherrer,* 334 U. S. 343, 92 L. Ed. 1429.

The domicil of one spouse within a state gives power to that state to dissolve a marriage wheresoever contracted. *Williams* v. *North Carolina,* 325 U. S. 226, 229, 89 L. Ed. 1577.

What is apt to result in a vicious circle of confusion results from our present rule, stated in the above cited case on page 232 that "[T]he decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, and domicil is a jurisdictional fact."

In this case Harriet K. Sullivan for herself, and Richard F. Corkey, as administrator of John F. Sullivan, challenge the validity of the finding of the Nevada court that John F. Sullivan was domiciled in that state.

We are concerned with the meaning of what have been called "two of the most uncertain word symbols in all the judicial lexicon, jurisdiction and domicile."

The Supreme Court of the United States has referred to "that rather elusive relation between person and place which establishes domicile." This court is bound and guided by the definition of domicil approved by the Supreme Court of Errors of Connecticut in *Rice* v. *Rice,* 134 Conn. 440, 445, where it says "To constitute domicil, residence at the place chosen for the domicil must be actual, and to the fact of residence there must be added the intention of remaining permanently; and that place is the domicil of the person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with the present intention of making it his home, unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home."

Our court has further said with reference to the matter of intent "this intention must be unqualified and not conditional upon the happening of a future event." It must be an intention "to make a home in fact, and not an intention to acquire a domicil."

The fact that the Nevada court found that John F. Sullivan was domiciled there is entitled to respect, and more. The burden of undermining the verity which the Nevada decree imports rests heavily upon the assailants. *Williams* v. *North Carolina,* 523 U. S. 226, 234, 89 L. Ed. 1577; *Rice* v. *Rice,* 134 Conn. 440, 447; U. S. Const. Art. IV § 1.

On all the evidence in the case the court is of the opinion that this burden has not been met.

In 1947 there were reasons which apparently strongly impelled John F. Sullivan to change his domicil. For five years he had been separated from his wife and reconciliation had been

agreed upon as impossible. His children were loyal to their mother. Time and chance and propinquity had resulted in his interest in another woman. He believed that as a result thereof she had borne him a son. He sought the advice of counsel. He determined to make his new home in Nevada: On March 17, 1947, John F. Sullivan abandoned his domicil in Connecticut and established his domicil in Nevada.

The determination of the question of good faith in so doing has required the analysis of and the drawing of inferences from many and varied facts in evidence. Among the more important facts in addition to those heretofore stated are the following: (a) Shortly after his arrival in Reno Mr. Sullivan began to look around for property to buy. With an agent he visited properties in Reno and Virginia City. (b) He stated he was making his home in Nevada and did not intend to go back east. (c) He opened a bank account June 10, 1947, in Las Vegas with an initial deposit of $9400, which account remained open until his death in 1949. (d) He purchased residential property in Las Vegas, June 9, 1947 at a cost of about $10,200. (e) He purchased an investment property in Las Vegas, June 9, 1947, at a cost of about $8500. (f) He managed the above property and made very extensive repairs thereon, using carpenters, plumbers and electricians. (g) After his marriage to Winona Peters in June, 1947, he remained in Nevada, in his home in Las Vegas, which was adequately furnished. (h) Mr. Sullivan made a hurried trip by air from Nevada to Connecticut in December, 1947, occasioned in part by the serious illness of his father, and after three days in New London returned to his family in Nevada by air. (i) On March 10, 1948, he filed his income tax return for the year 1947, in Nevada. (j) On April 7, 1948, he registered as a voter in Las Vegas, giving his occupation as real estate operator and residence as 927 South Second Street, Las Vegas. (k) Mr. Sullivan was very happy in his new family life in Nevada, the climate agreed with his health and as he said "The people out here mind their business." (l) In the spring of 1948 Mr. Sullivan began to be concerned about the way his New London business was being managed and planned to return to the vicinity of New London temporarily to give this business oversight. To facilitate this purpose and to give him cash he endeavored to dispose of his real estate in Las Vegas. Early in September, 1948, he sold one of his properties in Las Vegas. (m) He arranged for the management and oversight of the remaining property by Las Vegas people. (n) About the middle of September, 1948, he left Las Vegas for Connecticut, after telling

friends there he would be back before the snow flies. (o) On arrival in Connecticut he established his family in temporary quarters at White Sands Beach in the vicinity of New London. (p) In late November, 1948, he discussed with Massachusetts counsel the adoption of children of Winona Peters Sullivan and at that time stated he was a resident of Nevada.

The present action was brought because of and the main claims of the plaintiff rest on an incident which happened in New London on December 1, 1948.

Apparently between Thanksgiving Day 1948 and December 1, 1948, John F. Sullivan and Winona F. Sullivan had a serious quarrel. As a result thereof John F. Sullivan went on a "bender." He was observed drinking in a New London hotel bar late at night on November 30, 1948, by his son Robert K. Sullivan, who joined him, and John F. Sullivan continued to drink until about midnight, when they went to the room of John F. Sullivan in the hotel where the affairs of John F. Sullivan and Winona P. Sullivan were discussed. John F. Sullivan expressed a desire to get Winona P. Sullivan "off his neck" and Robert K. Sullivan suggested that his Reno divorce was no good. John F. Sullivan suggested that the plaintiff's lawyer be brought in and as a result thereof on the following day this lawyer was summoned to the hotel room of John F. Sullivan early in the morning. At this time John F. Sullivan still angry with Winona P. Sullivan, and still showing the effects of his drinking, and in such a nervous state that he required medical care, talked with his son Robert and his first wife's lawyer and made to them a number of statements which if true would seriously challenge the good faith of his Nevada domicil and the jurisdiction of the Nevada court to grant him his divorce.

As a result of his conference John F. Sullivan made a substantial sum available to be paid to his first wife's lawyer to enable him to go to Reno to investigate, and to bring an appropriate action. Within a few days thereafter John F. Sullivan entered an institution to be treated as an inebriate and about two weeks later upon being discharged therefrom, he sent word to plaintiff's lawyer to call everything off. This was not done, the suit was brought and John F. Sullivan secured a lawyer of his own and instructed him to enter and defend the action.

John F. Sullivan died suddenly March 27, 1949. At the instance of his children and to protect their interests Richard F. Corkey was appointed administrator of the estate of John F. Sul-

livan and subsequently became a party defendant in this case. The administrator in his pleading has admitted that the residence of John F. Sullivan in Nevada was colorable and only for the purpose of obtaining a decree of divorce, and he has placed at the disposal of the plaintiff his own skill and the resources of the administrator to prove this point.

In arriving at a decision the court has placed greater weight on the things John F. Sullivan did, than on the things he said, which at various times were subject to close scrutiny as self serving declarations. The court is mindful that this is a proceeding to determine the status of John F. Sullivan when he applied for a divorce in Nevada, in 1947, and is not designed to arbitrarily attempt to right any wrongs he may have been chargeable with in leaving his first wife in 1942.

The defendant Corkey has challenged the jurisdiction of the Nevada court, by casting suspicion on the continuity of the residence of and the physical presence of John F. Sullivan in Nevada for six weeks prior to the bringing of his divorce action, by showing that on various dates in March and April, 1947, letters were received from Sullivan postmarked Los Angeles, California; and that in the same period a number of telegrams were received from him which the Western Union notations indicated originated in Los Angeles. This evidence standing alone and unexplained is found by the court to be insufficient to overcome the record of evidence before the Nevada court, and the proper weight to be given its finding and judgment on this subject.

The parties are therefore advised that on March 17, 1947, John F. Sullivan abandoned his domicil in Connecticut and established his domicil in Nevada, that his residence and domicil in Nevada was not colorable and that the decree of divorce entered on June 3, 1947, by the Second Judicial District Court, Washoe County, State of Nevada, in favor of John F. Sullivan against the plaintiff, Harriet K. Sullivan, was founded upon proper and lawful jurisdiction, and dissolved the marriage between John F. Sullivan and Harriet K. Sullivan, and is entitled to full faith and credit by the State of Connecticut.