GRAY v. GRAY.

1. JUDGMENT—FOREIGN JUDGMENT.
    A foreign judgment is open to be assailed by evidence showing a want of jurisdiction.

2. DIVORCE—PARTIES.
    There are three parties to every divorce proceeding; the husband, the wife, and the State; the first two parties representing their respective interests as individuals; the State concerned to guard the morals of its citizens, by taking care that neither

by collusion nor otherwise, shall divorce be allowed under such circumstances as to reduce marriage to a mere temporary arrangement of conscience or passion.

3. SAME—JURISDICTION OVER PARTIES OF FOREIGN COURT—FINDINGS OF FACT.

While courts of this State may, under proper circumstances, make an independent investigation of facts in order to determine the question of whether a plaintiff in a foreign divorce proceeding was a bona fide resident of the foreign State, courts of this State may not review findings of fact made by a court of a sister State.

4. SAME—FOREIGN JURISDICTION—DOMICILE.

A State may inquire into and determine whether or not domicile was acquired in a foreign jurisdiction in which a divorce decree is granted.

5. HUSBAND AND WIFE—SEPARATE MAINTENANCE—NEVADA DIVORCE —RES JUDICATA.

In wife's suit for separate maintenance a *pro confesso* decree of divorce obtained by defendant in Nevada in a suit in which the wife had not been personally served with process and in which she did not participate *held*, not entitled to full faith and credit in view of fact that he had not obtained a bona fide residence in Nevada and that a determination had already been made to such effect between the same parties in a Federal court proceeding and no appeal taken therefrom (U. S. Const. art. 4, § 1; 3 Comp. Laws 1929, § 12794 *et seq.*).

6. SAME—SEPARATE MAINTENANCE—ALIMONY.

Sum of $50 per week *held*, proper amount for defendant to pay for support of wife suing for separate maintenance, in view of needs of plaintiff and financial ability of defendant and his willingness to provide a separate home for another woman and assume the expense of her maintenance (3 Comp. Laws 1929, § 12794 *et seq.*).

7. SAME—SEPARATE MAINTENANCE—ATTORNEY FEES.

Fees in sum of $2,000 for attorney for wife in suit for separate maintenance *held*, proper, where time spent in court was 14½ days and out of court was 533½ hours, due largely to unwillingness of defendant to support wife to whom he was married in 1905 (3 Comp. Laws 1929, § 12794 *et seq.*).

8. SAME—SEPARATE MAINTENANCE—FOREIGN DECREE OF DIVORCE.

In order to sustain a decree for the wife in a suit for separate maintenance, brought under statute providing for that relief only, defendant and plaintiff are still legally husband and

wife in this State, notwithstanding he had married another woman after obtaining a divorce in Nevada (3 Comp. Laws 1929, § 12794 *et seq.*).

Appeal from Wayne; Maher (Thomas F.), J. Submitted October 15, 1947. (Docket No. 39, Calendar No. 43,592.) Decided January 5, 1948.

Bill by Laura B. Gray against Russell B. Gray for separate maintenance. Decree for plaintiff. Defendant appeals. Affirmed.

*August F. Brandt,* for plaintiff.

*Davidow & Davidow,* for defendant.

BUSHNELL, C. J. This is an appeal from a decree entered April 5, 1946, in which plaintiff Laura B. Gray was granted separate maintenance and defendant Russell B. Gray was ordered to pay to the friend of the court as permanent alimony for the support and maintenance of plaintiff the sum of $50 per week, together with all existing arrearages in the temporary alimony theretofore ordered. By this decree, plaintiff was given the exclusive use of the homestead of the parties and defendant was required to pay all taxes, insurance and major repairs thereon. He was also required to pay plaintiff's attorney fees and costs in the sum of $2,282.59.

The parties were married in Pennsylvania in 1905. They have one child, a daughter, who was born in 1906. During the early years of their married life plaintiff did all her own work and also worked for others in order to augment the limited family income. After the parties came to Detroit in 1910 the defendant became more successful, and in 1922 he was earning about $135 per week. About that time

he organized a company for the manufacture of hubs for automobiles, which became a financial success. While the parties were living happily together, defendant became interested in another woman, left his home and built one for her, where he afterwards lived under an assumed name. In 1943 he requested his wife to consent to a divorce and, after her refusal, went to Nevada, where he was later joined by the woman with whom he had been associating.

The records of the El Cortez Hotel at Reno, Nevada show that Gray arrived at Reno on September 15, 1943, and lived at this hotel until January 24, 1944. The other woman registered as a guest at this same hotel on December 1, 1944, and lived there until Gray's departure. Gray testified in the instant case that he was not acquainted with anyone in Reno prior to September 16, 1943; nor was he gainfully employed while there. He admitted paying an employee of the hotel $5 for his services as a resident witness in the Nevada case. He said he returned to Michigan about December 14, 1943, after which he went back to Reno for a short while, and again returned to Michigan after January 23, 1944.

On November 9, 1943, plaintiff was served, by registered mail, with a notice of divorce proceedings in Nevada, but she did not enter her appearance therein. An uncontested decree of divorce was granted by the district court for the county of Washoe, Nevada on December 10, 1943. Defendant immediately discontinued providing support of any nature for his wife, and shortly thereafter married the other woman. Upon his return to Detroit a few weeks later he resumed his active management of the Gray Hub Company, a Michigan corporation, no change in its administration having been effected during his absence. Litigation between plaintiff and

defendants Gray Hub Company, Gray, its president and principal stockholder, and Harold J. Baumgartner, its treasurer, is dealt with in the case of *Gray* v. *Gray Hub Company, ante,* 39, decided herewith.

The bill of complaint in the instant case was filed on November 15, 1943. Defendant appeared specially, and on January 6, 1944, filed a motion to dismiss on the ground that the separate maintenance action was barred by reason of the divorce which he had obtained in Nevada on December 10, 1943. This motion was denied. Personal service was subsequently had upon the defendant in Michigan on February 6, 1944, and an order was entered on August 9th requiring him "to pay $50 a week as temporary alimony * * * commencing February 10, 1944."

Defendant, having been cited for failure to pay temporary alimony, instituted proceedings in the United States District Court to prevent enforcement of a contempt order in the State court. He based his right to relief in the Federal court upon the Nevada decree. United States District Judge Picard filed an opinion in which he concluded, as a matter of law, that, although full faith and credit should be given by Michigan courts to the Nevada divorce decree,* the bona fides of the divorcing parties' domicile could be questioned. Because of this he held that the Michigan court could proceed with the separate maintenance suit, and the Federal court would not prevent the enforcement of the contempt order. *Gray* v. *Gray,* 61 Fed. Supp. 367.

Plaintiff's bill, as amended, is planted upon the right of separate maintenance, as provided in 3 Comp. Laws 1929, § 12794 *et seq.* (Stat. Ann. § 25.211 *et seq.*), rather than under 3 Comp. Laws 1929,

---

* See Constitution of the United States, art. 4, § 1.—REPORTER.

§ 12728 (Stat. Ann. § 25.86). Nor did she seek any relief that might have been obtained under 3 Comp. Laws 1929, § 12761 (Stat. Ann. § 25.118).

In his appeal from a decree for separate maintenance Gray argues that the Nevada decree of divorce can not be collaterally attacked and must receive full faith and credit in Michigan. He further insists that his wife did not sustain the burden of proof and that the awards of alimony and attorney fees are excessive.

The first of these questions received attention in *People* v. *Dawell*, 25 Mich. 247 (12 Am. Rep. 260). In a comprehensive opinion, written by Mr. Justice COOLEY, this Court sustained a conviction of bigamy where the husband obtained a divorce in Indiana, either by collusion or fraud, from his wife when both of the parties were then living in Michigan. It is there stated (p. 256):

"It has been held invariably, that a foreign judgment is open to be assailed by evidence showing a want of jurisdiction."

The following observation from the *Dawell Case* is still applicable (pp. 257, 265):

"But it is said that if the parties appear in the case, the question of jurisdiction is precluded. That might be so if the matter of divorce was one of private concern exclusively. But such is not the case under our laws, nor will it ever be until it comes to be understood that parties have the right to marry and unmarry at pleasure, and that if they choose to trade spouses, it is the concern of nobody but themselves. Such an understanding would require a considerable change in the existing laws of this State. As those laws now are, there are three parties to every divorce proceeding; the husband, the wife, and the State; the first two parties representing their respective interests as individuals; the State

concerned to guard the morals of its citizens, by taking care that neither by collusion nor otherwise, shall divorce be allowed under such circumstances as to reduce marriage to a mere temporary arrangement of conscience or passion.    *    *    *

"To permit one of our own citizens who had obtained a decree of divorce abroad, to turn his wife out of doors in this State under it, would be scarcely less preposterous than to suffer a writ of possession to be executed in this State on a judgment in ejectment rendered abroad. If, however, the absurdity of the case were its worst feature, the public would be less concerned with it than they are now; but we can not shut our eyes to the fact, that these divorces are always fraudulent, are often obtained by perjury, in many cases are had secretly, and without any suspicion on the part of one party that such a proceeding is being taken, and that they tend, in defiance of our laws, to make marriage a mere provisional arrangement, which the parties may break up at will. Moreover, the foreign court has no power to make such provisions for the wife and children as, in many cases, would be necessary to prevent their being thrown upon the charities of the world, and if it had, it would generally be kept in ignorance of the facts, and therefore incompetent to make such provision."

Mr. Justice COOLEY further said (p. 254):

"Now I understand the rule to be, that to give the courts of any State jurisdiction over the marriage relation between a husband and his wife, one of the parties, at least, must have a domicil within that State. Some of the judicial decisions make further requirements; but no court has ever held that any less could be demanded. It is, then, and must be, admitted on all hands, that while these parties had their residence within this State, the courts of Indiana had no authority to consider the question of divorcing them. That was a matter which pertained

exclusively to the authorities of this State. Our legislation forbids plural marriages, but establishes exceedingly liberal regulations for divorce, under which parties who are wronged in their marriage relations are enabled to have them severed, on showing cause. But we do not think it conducive to good morals, or public decency, that married parties should be allowed to change spouses at discretion, or that a husband who had tired of his wife, whose charms perhaps had faded in the bearing and nursing of his children, should be at liberty at any time, by going through some formal proceeding in court, to turn her out of his doors, that he might supplant her with some fresher beauty. All our legislation has been framed in the belief that the marriage tie should be indissoluble, except upon cause shown; and of the sufficiency of this cause the parties themselves are not allowed to be the judges. This is the view that obtains in this State. It may be right, or it may be wrong. There have been those within the limits of the State who thought polygamy proper, and others who have believed that marriage should be only during the good pleasure of the parties; but the prevailing sentiment has condemned these notions as licentious and demoralizing, and has forbidden, under severe penalties, their practical realization within this State. If other States or countries hold different opinions, they can embody them in their own legislation, if they see fit; but it will be conceded that they have no right to invade our jurisdiction to right any wrongs which they may suppose to exist in our laws upon this subject.''

See, also, *Reed* v. *Reed,* 52 Mich. 117 (50 Am. Rep. 247); *Van Inwagen* v. *Van Inwagen,* 86 Mich. 333; and *O'Dell* v. *Goff,* 153 Mich. 643.

In *Re Elliott's Estate,* 285 Mich. 579, we said, in rejecting the claim of nullity of a foreign divorce:

''All that appellee claims is that the testimony adduced before the North Dakota court was insufficient

to warrant a finding by that court that the proponent had established a residence in North Dakota. While the courts of this State may, under proper circumstances, make an independent investigation of the facts in order to determine the question of whether a complainant in a foreign divorce proceeding was a *bona fide* resident of the foreign State, it is not the province of this Court to review findings of fact made by a court of a sister State."

That case and *Pratt* v. *Miedema,* 311 Mich. 64, are distinguishable from the instant case on their facts. In the former we held that there was no question that the moving party had established a domicile in the foreign jurisdiction. He went to Bismarck, North Dakota in the summer of 1907, with the intention of making it his permanent place of residence, homesteaded lands, and voted at elections thereafter. He did not secure his divorce until December of 1908, and did not remarry until 1927. In the latter case, after having been denied a divorce in 1941 in Michigan, plaintiff went to Nevada and there obtained a *pro confesso* decree, which was subsequently held invalid by the circuit court in Michigan. She then returned to Nevada, where a decree was granted her in 1943, in which case her husband appeared, filed an answer, offered proof, and raised the question of the validity of her domicile in Nevada. We therefore held that the alimony provisions of the Nevada decree were enforceable in Michigan, because defendant was bound by the decree in the case in which he had appeared.

The first question propounded in this appeal was exhaustively discussed in the recent cases of *Williams* v. *North Carolina,* 317 U. S. 287 (63 Sup. Ct. 207, 87 L. Ed. 279, 143 A. L. R. 1273), and *Williams* v. *North Carolina,* 325 U. S. 226 (65 Sup. Ct. 1092, 89 L. Ed. 1577, 157 A. L. R. 1366). See, also, *In re*

*Estate of Anna Holmes,* 291 N. Y. 261 (52 N. E. [2d] 424, 150 A. L. R. 447), and *Cohen* v. *Cohen,* 319 Mass. 31 (64 N. E. [2d] 689, 163 A. L. R. 362), and, also, the authorities therein annotated.

There is no longer any question in the light of these authorities of the right of a State to inquire into and determine whether or not domicile was acquired in a foreign jurisdiction in which a divorce decree is granted.

Our review of the testimony requires the conclusion that defendant did not acquire a bona fide domicile in the State of Nevada, and that when he secured a *pro confesso* decree of divorce there in a proceeding in which his wife did not participate and in which she was not personally served with process, such decree is not entitled to full faith and credit in Michigan.

Furthermore, the District Court of the United States disposed of this matter in *Gray* v. *Gray, supra,* in accordance with the applicable law of Michigan, and no appeal was taken therefrom.

We have further examined the needs of plaintiff and the financial ability of defendant and conclude, as did the trial judge, that, in the light of the testimony presented, the sum of $50 per week is a proper amount for the defendant to pay for his wife's support.

The services rendered by her attorney were both extensive and successful; and while the amount of time spent, *viz.,* 533½ hours out of court and 14½ days in court, is considerable, any unnecessary effort on his part was due solely to defendant's unwillingness to support his wife. If defendant could afford to secure a Nevada divorce, after having previously provided a separate home for the other woman and assumed the expense of her maintenance, there is no reason, in the light of his income as

disclosed by this record, why he should not pay his wife the amount ordered, together with her attorney fees of $2,000.

We are mindful of the fact that, in order to sustain a decree in an action brought under 3 Comp. Laws 1929, § 12794 *et seq.* (Stat. Ann. § 25.211 *et seq.*) we must hold that, so far as this State is concerned, plaintiff and defendant are still legally husband and wife, and we so hold.

The decree of separate maintenance is affirmed, with costs to appellee.

SHARPE, BOYLES, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.