### HENRY *v.* HENRY.

**1.** DIVORCE—DOMICILE—OTHER STATES—FULL FAITH AND CREDIT.

     One party to a married couple, domiciled in this State, may not go to another State solely in order to procure a divorce with the expectation it will subsequently be recognized in this State (US Const, art 4, § 1).

**2.** JUDGMENT—MOTION TO DISMISS—DECLARATORY JUDGMENT.

     Order denying motion to dismiss based on claim that wife's suit for declaratory judgment was inappropriate to determine validity of decree of divorce which husband had obtained in Nevada *held, res judicata,* where no appeal was taken and only the most cursory effort was made at the trial to preserve the issue for appellate review (CL 1948, § 691.501).

**3.** DECLARATORY JUDGMENT—VALIDITY OF NEVADA DECREE OF DIVORCE.

     Suit by wife for declaratory judgment as to whether or not Nevada decree of divorce which her husband had obtained was valid *held,* not subject to dismissal on ground of lack "of actual controversy" (CL 1948, § 691.501).

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 10, 13] 17A Am Jur, Divorce and Separation § 949.
[2] 30A Am Jur, Judgments § 342.
     Judgment as *res judicata* pending appeal. 9 ALR2d 984.
[3, 7] 16 Am Jur, Declaratory Judgments § 40.
     Action under declaratory judgment act to test validity or effect of a decree of divorce. 124 ALR 1336.
[4, 5, 6] 16 Am Jur, Declaratory Judgments § 18.
[8] 16 Am Jur, Declaratory Judgments § 76.
[9] 17A Am Jur, Domicile § 101.
     Nature and location of one's business or calling as element in determining domicile in divorce cases. 36 ALR2d 756.
[11] 30A Am Jur, Judgments § 945.
[12] 17A Am Jur, Divorce and Separation § 948.
     Recognition as to marital status of foreign divorce decree attacked on ground of lack of domicile. 1 ALR2d 1385, 28 ALR2d 1303.
[14] 17A Am Jur, Domicile § 2.
[15, 16] 17A Am Jur, Divorce and Separation § 957.

4. SAME—RIGHTS DETERMINED USUALLY NOT IN PRAESENTI.

Usually rights to be determined by declaratory judgment or decree may be, and perhaps are, rights not *in praesenti*, but rights which are to come into full fruition or which will be fully vested at some future time (CL 1948, § 691.501).

5. SAME—NEEDLESS HAZARDS—POSSIBLE LOSSES.

An actual present controversy justifying a declaratory adjudication is presented where uncertainties and controversies arise between interested parties as to what their respective rights will be when such rights accrue or become vested and it is necessary presently to have decision of such uncertain or controverted rights to avoid needless hazards or possible losses (CL 1948, § 691.501).

6. SAME—NECESSITY FOR PRESENT ADJUDICATION.

One test of right to institute proceeding for a declaratory judgment or decree is the necessity for present adjudication as a guide to plaintiff's future conduct in order to preserve legal rights (CL 1948, § 691.501).

7. SAME—DIVORCE—DOMICILE.

A suit for declaratory judgment is an appropriate remedy to declare void a divorce procured without domicile (CL 1948, § 691.501).

8. SAME—REVIEW BY SUPREME COURT.

The Supreme Court reviews a declaratory judgment *de novo*, since it is a chancery action (CL 1948, § 691.501).

9. DIVORCE—DOMICILE—LOCATION OF BUSINESS.

The location of a person's main business is not necessarily controlling as to his domicile, but it is a significant fact in indicating an actual intention to maintain or desert that domicile, where evidence shows he had always resided in the State where his business was located until marital difficulties arose, and when, during them, he continued his business without interruption in the State of original domicile.

10. SAME—NEVADA DECREE—DOMICILE—EVIDENCE.

Evidence presented in wife's suit for declaratory judgment to determine validity of husband's Nevada divorce decree *held*, to support finding of trial court that he had gone to that State to establish a residence solely for the purpose of obtaining a divorce and did not intend to establish a permanent residence, hence, that the Nevada decree was not entitled to full faith and credit here (US Const, art 4, § 1; CL 1948, § 691.501).

11. JUDGMENT—JURISDICTION.
   A foreign judgment is open to be assailed by evidence showing a want of jurisdiction.

12. DIVORCE—FOREIGN JURISDICTION—DOMICILE.
   A State may inquire into and determine whether or not domicile was acquired in a foreign jurisdiction in which a divorce decree is granted.

13. SAME—PRO CONFESSO DECREE—NEVADA DOMICILE.
   A *pro confesso* decree of divorce obtained by defendant husband in Nevada in a suit in which the wife had not been personally served with process in that State and in which suit she did not participate *held,* not entitled to full faith and credit in her suit for declaratory judgment in view of fact that he had not obtained a bona fide residence in Nevada (US Const, art 4, § 1; CL 1948, § 691.501).

14. WORDS AND PHRASES—DOMICILE.
   Domicile is that place where a person has voluntarily fixed his abode, not for a mere special or temporary purpose, but with a present intention of making it his home, either permanently or for an indefinite or unlimited length of time.

15. DIVORCE—NEVADA DECREE—FULL FAITH AND CREDIT—BURDEN OF PROOF.
   Party attacking a presumptively valid decree of divorce secured in a sister State as not entitled to full faith and credit has the burden of proof that there was no domicile established in such other State (US Const, art 4, § 1).

16. SAME — NEVADA DECREE — BURDEN OF PROOF — DOMICILE — EVIDENCE.
   Plaintiff wife in suit to declare void a Nevada *pro confesso* decree of divorce which husband had obtained *held,* to have sustained her burden of proof that he had not established domicile, where it was shown he continued the conduct of his business in this State, obtained his divorce within 3 months of the time he went there, maintained his club memberships and his principal bank accounts here and returned to this State with his purported wife to whom he was married 8 days after she obtained her divorce (US Const, art 4, § 1; CL 1948, § 691.501).

Appeal from Wayne; Gilmore (Horace W.), J. Submitted April 12, 1960. (Docket No. 46, Calendar No. 48,240.) Decided December 2, 1960. Rehearing denied January 9, 1961.

Bill by Serena Ailes Henry against Thomas Patrick Henry for declaratory judgment determining void a decree of divorce which defendant obtained in Nevada and determining the marriage between the parties in full force and effect. Decree for plaintiff. Defendant appeals. Affirmed.

*Piggins, Balmer, Grigsby, Skillman & Erickson,* for plaintiff.

*James E. Haggerty (George E. Brand,* of counsel), for defendant.

EDWARDS, J. Michigan law provides no quick and easy divorce. Nor, when a married couple is domiciled in Michigan, may one party go to another State solely in order to procure a divorce with the expectation that it will subsequently be recognized in Michigan. *Gray* v. *Gray,* 320 Mich 49. This appeal illustrates the tragic results of ignoring this long-established rule.

Mr. Henry, a lifetime Michigan resident, desiring a divorce from his wife of 24 years, went to Nevada in 1954 and procured one in 1955. No personal service was had on Mrs. Henry in Nevada, nor did she appear. Mr. Henry then remarried and returned to Michigan in 1956. In 1957 Mrs. Henry brought a bill of complaint for declaratory judgment in Wayne circuit court to declare Mr. Henry's Nevada divorce void.

The circuit judge who heard the extensive testimony found that Mr. Henry had not acquired domicile in Nevada, that the Nevada court never acquired jurisdiction of Mrs. Henry, and that the Nevada divorce was void.

The husband's appeal attacks the declaratory judgment action as inappropriate, and argues that the testimony taken at hearing was not sufficient to over-

come the finding of jurisdiction made by the Nevada court or the presumption of validity to which the Nevada decree was entitled under the full faith and credit clause of the United States Constitution.

The declaratory judgment issue had been the subject of defendant's motion to dismiss plaintiff's bill of complaint. This motion was heard and denied before the cause was assigned for hearing on the merits. No appeal was taken and at hearing the circuit judge treated this issue as *res judicata*. Only the most cursory effort was made at trial to preserve the issue for appellate review.

In addition to agreeing that the issue was *res judicata* by time of hearing, we also agree with the denial of the motion. Under the circumstances related herein, there is obviously a real and important issue between the parties in a case "of actual controversy," to employ the words of the statute. CL 1948, § 691.501 (Stat Ann § 27.501).* Appellant's argument is that what the wife seeks is merely an affirmation of her status as a wife—and that such status is to be distinguished from the assertion of any legal rights. We are unable to agree with this distinction. We can think of few rights of greater consequence to a woman than those which are placed in jeopardy by her ignorance as to whether she is or is not married. Her rights to companionship, protection, home and sustenance from her husband are all at issue in this suit. And the fact that compelling the furnishing of the first 2 of these is beyond the reach of ju-

---

* "No action or proceeding in any court of record shall be open to objection on the ground that a merely declaratory judgment, decree or order is sought thereby, and the court may, in cases of actual controversy, make binding declarations of rights whether any consequential relief is or could be claimed, or not, including the determination at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance or other governmental regulation, or any deed, will or other instrument in writing, and a declaration of the rights of the parties interested, but the foregoing enumeration does not exclude other cases of actual controversy."

dicial decree does not serve to avoid the fact that the last 2 obviously are rights which may be upheld by legal processes.

While the issue pertaining to marital status presented herein has never heretofore been passed upon in Michigan, this Court has said:

"But the rights to be determined by declaratory judgment or decree may be and perhaps usually are rights not *in praesenti,* but rights which are to come into full fruition or which will be fully vested at some future time. If uncertainties and controversies arise between interested parties as to what their respective rights will be when such rights accrue or become vested, and to avoid needless hazards or possible losses, it is necessary presently to have decision of such uncertain or controverted rights, then there is actual need of and justification for declaratory adjudication. Otherwise there is no actual present controversy in the true sense, and no need of nor justification for litigation of this character. If the parties will not be subjected to loss nor their rights impaired by instituting proceedings after the alleged rights accrue rather than resorting to declaratory proceedings prior to the actual accrual of such rights, there is no justification for asking a declaratory judgment or decree. At least 1 of the tests of right to resort to a declaratory proceeding is the 'necessity for present declaratory judgment as a guide to plaintiff's future conduct in order to preserve its legal rights.' *Wolverine Mutual Motor Ins. Co.* v. *Clark,* 277 Mich 633, 637, 638." *City of Flint* v. *Consumers Power Co.,* 290 Mich 305, 309, 310.

See, also, *Bane* v. *Township of Pontiac,* 343 Mich 481.

We can conceive of few situations where the need for a declaration of rights is more related to guidance of the future conduct of these parties than that posed by this case.

Furthermore, declarations of rights concerning an out-of-State divorce are not novel in the nation. There is ample precedent which holds that an action to declare void a divorce procured without domicile is an appropriate remedy under statutes similar to that of Michigan. *Hogan* v. *Hogan,* 320 Mass 658 (70 NE2d 821); *Baumann* v. *Baumann,* 222 App Div 460 (226 NYS 576). *Id.* (on trial), 132 Misc 217 (228 NYS 539) 224 App Div 719 (229 NYS 833), aff'd 250 NY 382 (165 NE 819); *Melnick* v. *Melnick,* 147 Pa Super 564 (25 A2d 111).

Borchard says on the specific issue:

"The more typical situation is that in which one of the parties to an earlier marriage wishes to assert its continued validity and the invalidity of a second marital relation. As a rule, one spouse has left the matrimonial domicile, secured a divorce in another State without service of process on the deserted spouse, and then possibly contracted a second marriage. Not caring to undertake an action for divorce or annulment of the second marriage or, if the wife, a suit for support and maintenance, the deserted spouse can obtain effective relief from the uncertainty of his or her status by an action for a declaration that plaintiff is still the wife (or husband) of the defendant and that the purported divorce and hence the remarriage are void." Borchard, Declaratory Judgments (2d ed), p 479.

Appellant's primary reliance, in this appeal, however, is upon his assertion (variously phrased) that the factual record developed in this case did not warrant a declaration that his Nevada divorce was void.

The circuit judge, after hearing extensive testimony, entered these findings in his opinion:

"The facts of the case * * * show that in the spring of 1954 the defendant asked the plaintiff for a divorce; that there were conversations in regard to this matter throughout the summer and that the

plaintiff refused to institute suit for divorce against the defendant in Michigan. In September, 1954, the defendant moved out of the house in Grosse Pointe to the Parkstone Hotel and stayed there until approximately December of 1954. During the year 1954 the testimony shows that the defendant consulted with Mr. Harrison T. Watson, an attorney, and learned from him the divorce laws of many other States, and conferred with Mr. Ailes, the brother, who is a reputable attorney, as is Mr. Watson, of the Detroit Bar. Mr. Ailes is the brother of the plaintiff. There is a dispute as to the exact conversation between the defendant and Mr. Ailes, Mr. Ailes testifying that the defendant said he would go to Nevada to get a divorce, the defendant denying it.

"In December of 1954 the defendant went first to Texas and then to Las Vegas, Nevada. He left Detroit without notice to his wife and carried with him personal effects. The testimony I believe was as much as he could get into his car. After being in Las Vegas for approximately 8-1/2 to 9 weeks, he in February, 1955, instituted a divorce action against the plaintiff. The testimony shows that prior to the institution of this divorce action, he had been consulting with an attorney in Las Vegas for approximately a 6-weeks' period. One month after the divorce action was started the court in Nevada granted him a divorce on March 22d, or March 23d, 1955.

"The facts further show that with reference to the business of the Thomas P. Henry Company there was no change at any time in the management of the company, or in its operation. There were repeated trips after the granting of the divorce on March 22, 1955, to Detroit, and the facts further show that the plaintiff retained membership in Detroit clubs, in which both he and his family participated, kept tight control of the Thomas P. Henry Company, and maintained his principal bank account at the National Bank of Detroit, although he had opened an account in the National Bank of Nevada After the granting of the divorce in Nevada on March

22, 1955, the defendant was absent from Las Vegas a great deal of the time. From April, 1955, until he finally left in May, 1956, the facts show that he was out of the city of Las Vegas approximately 200 days. At no time after the divorce was granted did he stay in Las Vegas more than 30 days at 1 time.

"In December, 1955, the defendant remarried and returned sporadically to Las Vegas, but finally on May 5th, left Las Vegas for good.  *  *  *

"There is no question in the instant case but what formal steps were taken to acquire domicile; voting registration, bank account, renting of an apartment, purchasing of a lot, sporadic physical presence, and payment of an income tax. But other and stronger factors in the opinion of this court show that the basic purpose of the defendant in going to Nevada was first and primarily to obtain a divorce. This is emphasized, I think, and borne out by the repeated requests of the defendant for the divorce, by his conferences with Mr. Harrison T. Watson and Mr. Edgar Ailes, and the court finds here as a matter of fact that he did state to Mr. Ailes that he did intend to go to Nevada to obtain a divorce. His constant and continuous control of the business of the Thomas P. Henry Company belies his continued residence in Nevada. His retention of membership in all his clubs in Detroit, the quick starting of the suit in Nevada after being there only 9 weeks, his repeated absences from Las Vegas after the divorce was granted, the lack of any business of any kind in Las Vegas and his prompt remarriage to Mrs. F. a few days after she obtained her divorce all indicate to the court that the defendant in this case went to Nevada not for the purpose of establishing residence but for the purpose of obtaining a divorce. The court concludes that the actions taken in Nevada were taken on the advice of counsel for the specific purpose of creating evidence in anticipation of a situation similar to the one we have here today, and that the defendant had at the time of going to Nevada no firm intention of making Las Vegas his home. He had no friends in Las

Vegas, he knew no one in Las Vegas, his roots were deep in Michigan. This court finds that the sole object of the defendant in going to Las Vegas was for the purpose of establishing residence for the sole purpose of obtaining a divorce."

While appellant disputes the weight to be given and the interpretation to be placed on all these facts, the only actual dispute of fact pertains to whether or not Mr. Henry stated "to Mr. Ailes that he did intend to go to Nevada to obtain a divorce."

Mr. Ailes is Mrs. Henry's brother and a prominent attorney in Detroit whose firm represented the Thomas P. Henry Company up to 1954. At the hearing, he testified concerning Mr. Henry:

"He came and said that *to the* [it was a?] source of much regret to him to have to advise me that he was determined to get a divorce from my sister. He wanted me to initiate the proceedings in her behalf and said he would not contest it. I told him that she had no intention of divorcing him and did not think that a divorce would be conducive to his happiness or hers. He then said that if we would not co-operate by suing him for divorce he would sue her for divorce. I told him what the grounds for divorce were under the laws of Michigan and he said that might or might not be so, but if he could not get a divorce in Michigan he would get one from some other State. I told him that such a divorce would be legally invalid and would not be recognized in this State and he said he would see about that later, or words to that effect. I may say also that I urged him not to take any such step."

Mr. Henry, on his part, denied making this statement:

"*Q.* Did you state to him, Mr. Ailes, that you would get a divorce in another State?

"*A.* I certainly did not. I had no intention of doing so at that time.

"*The Court:*   You did not say you would go to another State?

"*A.* I did not."

The important question, of course, is not really whether or not Mr. Henry told Mr. Ailes that he was going to go to another State to get a divorce, but rather whether, in fact, he did so without ever intending permanent residence there.

The conversation referred to took place around September, 1954.   In December, 1954, Mr. Henry went to Las Vegas, Nevada, and a fascinating exchange of letters between Mr. Ailes and Mr. Henry took place.   We will reproduce only the first 3:

"3456 Penobscot Building
Detroit 26
"January 17, 1955

"Mr. Thomas P. Henry
The Thos. P. Henry Co.,
41 Burroughs,
Detroit 2, Michigan.

"*Dear Tom:*

"I heard today that you are in Las Vegas and have been there for a month.   Since it seems unlikely that you are staying there for the gambling or the climate, I assume that there must be some truth in the cocktail party gossip that you are planning to get a Nevada divorce.

"Writing as a friend of yours and not as Serena's attorney (I reiterate my assurance that, if there are to be any legal hostilities, you will have to commence them and Serena will have to get other counsel), I hope to dissuade you from such a course.

"If you have proper legal advice, you will learn that a Nevada divorce will not be worth the paper the decree is written upon and that if, in reliance upon such a divorce, you should marry the lady of your choice, you will risk a prosecution for bigamy. A Nevada divorce would be pretty shaky if Serena appeared there and consented to the decree; in her

absence, it will be a nullity. Only Michigan—the matrimonial domicile—can legally terminate your marriage. And even *if* Nevada *could* dissolve the marriage, it is powerless to affect your Michigan property or to make any effective decree in respect of the custody of the children.

"Fred Black, at great expense, discovered the truth of the foregoing propositions.

"I don't know the solution for your problems and I won't presume to advise you about your duties. But I *am* confident that a Nevada divorce will be worthless and I hope this timely warning will save you from making a serious blunder.

"Yours sincerely,
"NED
"Edgar H. Ailes."

"Wednesday, January 26
*"Dear Ned:*

"This is to acknowledge your letter dated January 17th, which was forwarded by my office. I have read it carefully and discussed with the attorney here who is advising me the points which you have made. As you are probably aware, he does not entirely agree with your analysis of the situation.

"In fact, I have asked him to prepare some ideas for your consideration. Things of a business nature don't seem to move too fast out here, but I'm sure you will hear from him in a few days.

"Your interest is certainly appreciated. I regret that the situation is as it is, but I feel I cannot do other than I am.

"Sincerely,
"TOM."

"Thomas P. Henry
41 Burroughs Avenue
Detroit, Michigan
　　　　　　"February 3, 1955,
　　　　　　Post Office Box 831,
　　　　　　Las Vegas, Nevada.

*"Dear Ned:*

"After considerable more thought about your letter of January 17, 1955, I have decided it would be best for me to answer it personally. First of all, I want to assure you it was received and accepted by me in the same spirit in which you wrote it, namely, as a communication from a friend of long standing, not a lawyer interested in the case.

"I have taken the liberty of discussing the contents thereof with my attorney here, Mr. G. William Coulthard, and while he respects your right to hold your own opinions as a lawyer (and a very good one as I assured him), he cannot subscribe to your conclusions as you outline them.

"It is his opinion that the residence which I have established here is bona fide in every degree and it being my firm intention to make Las Vegas my permanent domicile, he does not agree that in the event, at some subsequent date, I should institute an action for divorce the jurisdiction of the Nevada courts could be successfully challenged here or in any other jurisdiction.

"I am not inclined to burden you with my personal problems, of which you already have more than an inkling, because I respect your decision that in the event of a divorce suit, you would insist on stepping completely out of the picture. I will, however, tell you that if I should ultimately decide to take action here along that line, it will be in the knowledge, based upon the best legal advice obtainable, both locally and in the State of Michigan, that the jurisdictional requisites have been fully met beyond either reproach or chance of successful attack.

"Should that be my decision, neither matters of title to Michigan real estate nor questions of custody

would be of great moment. I have never denied Serena's right to reasonable support, of occupancy of our home, nor to primary custody of the girls. Neither do I intend to upon present considerations. Fortunately, our daughters are quite capable of making up their minds as to their loyalties and preferred affiliations, although I certainly recognize the importance of maternal advice and counsel for them.

"And, even though you cannot act as lawyer for either of us, I have no objection, and in fact would appreciate your bringing the foregoing matters to Serena's attention.

"As far as Serena and I are concerned, it does seem ridiculous for persons who have reached our respective maturities to be quarreling at long range. Unfortunate as it may be, there are no problems in our case which haven't been met and solved with intelligence and dignity by literally thousands of other couples.

"It's as simple as stating it. If there exists no possibility whatever for a man and wife to continue to live together in harmony and happiness and no court in the land can or will insist that they must, what is to be gained by prolonged warfare?

"If you believe it would be beneficial to further discuss the legal aspects of the situation with Mr. Coulthard, he assures me he would be happy to hear from you at your convenience. If, on the other hand, you would care to intercede at my invitation, which is hereby extended, but would rather process any suggestions and discussions in Detroit, please advise me accordingly and I will arrange to put you in touch with counsel who will represent me in such event.

"Sincerely,<br>"Tom."

"TPH–eh

This being a chancery action, we, of course, review the record *de novo*. The reliance we customarily place on the hearing judge's findings on disputed facts (*Hartka* v. *Hartka,* 346 Mich 453) would incline

us to accept the Ailes version of the disputed conversation, particularly since the exchange of letters is entirely consistent with the continuation of the prior argument.

But there is little reason to pin our affirmance solely upon the disputed conversation. There is simply nothing about this record which suggests that an actual change of domicile for any purpose other than divorce was ever intended or accomplished.

In the spring of 1954, while the parties were on vacation at Sea Island, Georgia, Mr. Henry told his wife that he had fallen in love with a lady who, with her husband, had been the Henrys' vacation companions. He also told her that he intended to marry this lady as soon as he and she could secure divorces. He repeatedly urged his wife to file suit in Michigan for the divorce.

When she refused, he left home, went to Nevada and 8 weeks after arrival there filed suit for divorce which was granted within 4 weeks. He then maintained an apartment in Nevada until the lady of his choice secured her divorce in December, 1955. Eight days later, to complete the plan conceived a year-and-a-half earlier, the newly divorced became "newly wed." Five months later, by May, 1956, Mr. Henry, with his purported wife, had returned to Michigan.

During all of this 1–1/2 year period, Mr. Henry's main source of income and employment was the Thomas P. Henry Company in Detroit. During all of this period, he maintained constant contact with it and effective supervisory control of it. He never let his membership in the Detroit Athletic Club or the Detroit Club lapse. He maintained his principal bank account at the National Bank of Detroit. It is clear that Mr. Henry never intended to dispose of his business in Michigan, or to alter his business relationships in Michigan.

The location of a person's main business is not necessarily controlling as to his domicile. But when, as here, he has always resided in the State where his business was located until marital difficulties arose, and when, during them, he continued his business without interruption in the State of original domicile, this fact becomes a significant one in indicating an actual intention to maintain or desert that domicile. *Elwert* v. *Elwert,* 196 Or 256 (248 P2d 847, 36 ALR 2d 741); annotation, 36 ALR2d 756.

We do not ignore Mr. Henry's elaborate efforts to establish a Nevada domicile:

December 23, 1954, he went to Las Vegas,

January 24, 1955, he leased an apartment for 1 year,

February 7, 1955, he purchased a vacant lot,

February 11, 1955, he bought 100 shares of stock in the Golden Nugget (a Las Vegas gambling house),

February 24, 1955, he filed his bill of complaint for divorce,

March 22, 1955, the divorce was granted.

To us, this recital is much more indicative of contrivance than real intention to adopt Las Vegas as a permanent home.

In short, like the circuit judge, we believe Mr. Ailes' testimony about Mr. Henry's expression of intention to go to another State to get a divorce. We find confirmation of this in his admitted conversations with his wife and children concerning his intentions to secure a divorce and marry another woman. We find further confirmation of failure to establish Nevada domicile in the fact that he never altered the relationship of his main business to the State of Michigan, nor really altered his own relationship to it. Finally, we find confirmation of lack of domicile in Nevada in those very acts upon which Mr. Henry relies for proof of domicile. A vacant lot, 100 shares

of Gold Nugget stock, a 1-year lease on a 1-bedroom flat, might well be termed indicia of domicile by a divorce lawyer practicing in Nevada; but, on this record, they become rather obvious tools to effect the purpose of an out-of-State divorce.

In *People* v. *Dawell*, 25 Mich 247, 256 (12 Am Rep 260), Mr. Justice COOLEY said:

"It has been held invariably, that a foreign judgment is open to be assailed by evidence showing a want of jurisdiction."

In *Gray* v. *Gray, supra,* on a record showing very similar facts, this Court held (p 58):

"There is no longer any question in the light of these authorities of the right of a State to inquire into and determine whether or not domicile was acquired in a foreign jurisdiction in which a divorce decree is granted.

"Our review of the testimony requires the conclusion that defendant did not acquire a bona fide domicile in the State of Nevada, and that when he secured a *pro confesso* decree of divorce there in a proceeding in which his wife did not participate and in which she was not personally served with process, such decree is not entitled to full faith and credit in Michigan."

In this holding, the Court relied upon *Williams* v. *North Carolina,* 317 US 287 (63 S Ct 207, 87 L ed 279, 143 ALR 1273), and *Williams* v. *North Carolina,* 325 US 226 (65 S Ct 1092, 89 L ed 1577, 157 ALR 1366). See, also, 163 ALR 368.

In the second *Williams Case,* the court approved this definition of domicile (p 236):

"Domicile [is] that place where a person 'has voluntarily fixed his abode not for a mere special or temporary purpose, but with a present intention of mak-

ing it his home, either permanently or for an indefinite or unlimited length of time.' "

We have no doubt, as appellant's counsel contend, that in attacking a presumptively valid decree of divorce issued by a sister State, the full faith and credit clause (US Const, art 4, § 1) and ample case precedent (*Williams* v. *North Carolina,* 325 US 226, 234; *Cook* v. *Cook,* 342 US 126, 128 [72 S Ct 157, 96 L ed 146]) demand that the attacking party bear the burden of proof that no domicile was established.

She did.

No other issues of substance are presented.

Affirmed. Costs to appellee.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, KAVANAGH, and SOURIS, JJ., concurred.